2021 IL App (1st) 210135

THIRD DIVISION
November 17, 2021

No. 1-21-0135

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| US BANK TRUST, N.A., as Trustee for LSF11 Master Participation Trust, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | |
| LYNETTE BURNETT and ALL UNKNOWN OCCUPANTS, | ) ) ) | No. 20 M1 705770 |
| Defendants | ) ) ) | |
| (Michelle Gilbert, Edward Campbell, and Lawyers' Committee For Better Housing, | ) ) ) | Honorable James A. Wright, |
| Appellants). | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    Appellants, Michelle Gilbert and Edward Campbell, are attorneys who work for the Lawyers' Committee for Better Housing (LCBH), a not-for-profit legal aid organization that represents individuals who are unable to afford private counsel in eviction proceedings. Gilbert and Campbell represented defendant, Lynette Burnett, in an eviction action brought by plaintiff, US Bank Trust, N.A., as trustee for LSF11 Master Participation Trust (US Bank). During the

course of those proceedings, the trial court assessed a sanction against Gilbert and Campbell, as well as their employer, LCBH, in the amount of $2000 pursuant to Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018), finding that they failed to perform a reasonable inquiry into certain allegations made by their client, Burnett, regarding a conversation she had with counsel for US Bank, Steven Anderson. Gilbert, Campbell and LCBH appeal that judgment, arguing that the award was based on several errors and should be reversed.

¶ 2      The record shows that on August 26, 2020, US Bank filed a verified complaint for eviction, seeking to evict Burnett from the residence located at 824 East 38th Place #D3-105, in Chicago. US Bank alleged that on or about August 18, 2020, its agents had discovered that Burnett "and others," later determined to be Burnett's two young children, had moved into that residence. US Bank stated that when Burnett was found in occupancy of the premises, she produced a "[b]ogus [l]ease" showing that the residence had been rented to her effective July 1, 2020, by an individual named Oscar Sanchez. US Bank stated that it had "no idea who Oscar Sanchez" was, that he was not authorized by US Bank to take any actions related to the residence, and that he had not returned any phone calls made to him by counsel for US Bank. US Bank alleged that its counsel contacted Burnett by phone and email to request that she voluntarily vacate the premises, and although Burnett "acknowledged that she was likely the victim of a scam," she refused to vacate. US Bank characterized Burnett and her family as "squatters," further alleging that they "illegally entered the property without authorization (presumably by breaking in and chang[ing] the locks)," and stated that they "now den[ied] [US Bank] access to the Premises such that [US Bank] cannot further determine how many individuals are residing therein nor what activities are taking place inside the premises." US Bank alleged that Burnett's "continued occupancy of the building constitute[d] a threat to [the] health and safety of other occupants of the building" and posed a "severe risk" to

the property itself. US Bank attached documentation indicating that it had acquired the property in April of 2019 through a public sale after foreclosure.

¶ 3    On September 16, 2020, Burnett and US Bank appeared before the trial court via Zoom.[1] Burnett was self-represented, and attorney Anderson appeared on behalf of US Bank. During the hearing, Burnett informed the court that she had a previous conversation with Anderson during which Anderson alleged that she had no legal basis to be in possession of the residence because Sanchez had no authority or legal right to lease the residence to her. Burnett told the court that, after speaking with Anderson, she contacted Sanchez and informed him that US Bank was seeking possession of the premises. Burnett further stated that she attempted to speak with Sanchez on subsequent occasions, but those attempts were unsuccessful.

¶ 4    After hearing from both parties, the court indicated that, unless the parties were able to reach an agreement, a trial date would be set for approximately one week later, to give Burnett time to prepare and consult with or hire an attorney. The court apprised Burnett that if the case proceeded to trial, US Bank would have the burden of proving its case. The court also informed Burnett that she may have defenses to US Bank's allegations and assertions that could be offered at trial. The court further stated that if US Bank was able to satisfy its burden after a trial, the court would stay the eviction for about a week, after which US Bank could file the eviction order with the Sheriff's Department to effectuate the eviction. The court asked Burnett if she understood the ramifications of losing at trial, and she said that she did.

_____

[1]Except for the hearing that took place on November 9, 2020, the record in this case does not contain transcripts from the relevant court proceedings. In lieu of transcripts, the parties submitted agreed statements of facts for the hearings conducted on September 16, 2020, October 13, 2020, and January 7, 2021.

¶ 5    Attorney Anderson then requested that the court engage in a pretrial settlement conference to attempt to resolve the matter. The court asked Burnett if she was open to discussing settlement but advised her that she was not required to do so, as she had been granted a week to consult an attorney. Burnett agreed. The court then asked Anderson how much time US Bank would be willing to give Burnett to vacate the residence, and Anderson responded that if Burnett agreed to vacate by October 9, 2020, admit to the allegations of the complaint, and agree to a mutual waiver of claims, US Bank would dismiss the case and would not oppose sealing the file.

¶ 6    The court asked Burnett if she wanted to accept US Bank's offer and she said that she did. The court cautioned Burnett that if she accepted, she would be held to the terms of the agreement. If she vacated the residence on or before October 9, 2020, the case would be dismissed and the file would be sealed. However, if she failed to vacate by that date, US Bank would request and receive an "order of possession *instanter*" and the file would be unsealed. The court asked Burnett if she understood the repercussions of failing to vacate the residence by the agreed date, and she said that she did.

¶ 7    Anderson then informed the court that Burnett had not responded to his previous e-mails and requested authorization to draft an agreed order reflecting the terms of the agreement and indicating that Burnett had agreed to those terms in open court. The court asked Burnett if she had any issue with Anderson's request, and Burnett responded that she did not. The court granted Anderson's request, and Anderson confirmed Burnett's e-mail address. The court instructed Anderson, and he agreed, to copy Burnett on the e-mail when he submitted the agreed order to the court. Anderson further said that he would "include the appropriate language" in the preamble of the agreed order indicating Burnett's agreement to its terms in open court via Zoom.

¶ 8 Later that day, the court entered an "Agreed Order for Unauthorized Occupants to Move Out," noting that "the parties have reached a settlement as affirmed by Defendant Burnett via Zoom in Court on 9/16/20 at 9:30 a.m." The order indicated that Burnett "admit[ted] to the allegations in the Complaint and agree[d] that she and any other occupants shall voluntarily relinquish possession by 5:00 p.m. on October 9, 2020." Burnett further agreed that if she failed to move, "an Eviction Order enforceable *instanter* shall enter against her and all occupants instanter as of the date of the Compliance Status hearing." Burnett agreed to "waive and fully release any and all CRLTO claims, personal injury claims and/or claims of any nature that [she] ha[d] or may have against [US Bank], its shareholders, attorneys, agents and members related to [Burnett's] occupancy and use of the subject property and this lawsuit." Finally, the agreed order provided that, if Burnett vacated, "[US Bank] shall dismiss this suit without prejudice at the Compliance Status hearing and seal it."

¶ 9 The Order further stated that "[a]ny and all claims that [Burnett] ha[d] or may have against [US Bank] *** are waived and fully released with prejudice *instanter*;" that if she was "still in possession of the premises after 5:00 p.m. on 10/9/20 an Eviction Order enforceable *instanter* *** shall enter at the Compliance Status hearing instanter. If [she] vacated as agreed, this matter will be dismissed without prejudice and sealed."

¶ 10 Subsequent to the September 16, 2020, hearing, Burnett sought legal counsel from Gilbert and Campbell through LCBH (collectively, the LCBH attorneys). On October 8, 2020, Burnett filed a "Combined Motion to Vacate Alleged Agreed Order, Dismiss the Case Pursuant to Section 2-619, and Seal the Record," which was signed by Campbell.

¶ 11 Burnett argued that the agreed order should be vacated for several reasons. First, Burnett asserted that she "did not and, indeed, could not have agreed to the entry of [the] order" because

Anderson prepared the order and sent it to the court without showing it to her first. Second, Burnett argued that the agreed order should be vacated because the parties "had grossly disparate capacity in discussion of the 'agreed' order," pointing out that Anderson is an "experienced eviction attorney," while Burnett was a *pro se* litigant at the time of the order's entry. She argued that, as a *pro se* litigant, Burnett was unable to understand "what she was purportedly agreeing to even if she had been shown the alleged agreed order," which used "confusing legal terminology that a *pro se* person cannot understand." Burnett also alleged that the agreed order "lack[ed] consideration and [wa]s an invalid contract." Burnett additionally asserted that she had certain defenses to the eviction action, which she had been unable to explain because she lacked counsel at the hearing. Specifically, she argued that US Bank's complaint "violate[d] the state moratorium prohibiting eviction lawsuits," enacted as a result of the COVID-19 pandemic, and that US Bank shared responsibility for the "bogus" lease, in that it allowed the residence to be controlled and rented out by a third-party.

¶ 12    Finally, Burnett contended that Anderson "conducted himself fraudulently and unfairly in his dealings" with Burnett, "by eliciting all of the facts of her situation before identifying himself as an attorney for the opposing party," by "discouraging her from seeking the advice of her own counsel," and by "filing a petition that was not well-grounded in law and fact."

¶ 13    In support of Burnett's motion to vacate, she attached her own affidavit, in which she averred to the process by which she came into possession of the residence and averred to her interactions with Anderson. Specifically, Burnett averred that she signed a lease for the residence on July 1, 2020, after finding the residence through an online listing. Burnett viewed the residence twice with Oscar Sanchez, who identified himself as the landlord, before signing the lease and moving in with her two young daughters. Burnett stated that Sanchez had unfettered access to the

residence, that he interacted with neighbors at the residence in a friendly manner, and that he came to mow the lawn a few weeks later. Burnett paid him a security deposit of $1500, as well as $1500 in rent for each of July and August.

¶ 14    Burnett stated that she learned that a bank owned the property on August 18, 2020, when a realtor knocked on Burnett's door and demanded to know who she was. The next day, August 19, 2020, Anderson called Burnett. Burnett averred that Anderson did not identify himself as an attorney initially and did not inform her that he represented US Bank, but instead stated that he was "working with the new 'buyer' who wanted to move in." Anderson explained that Burnett had been "scammed" and said the landlord she had dealt with was "fake," adding that such scams were not uncommon and that he was handling numerous similar cases. Anderson disclosed later in the conversation that he was an attorney representing US Bank, which "came as a shock" to Burnett, and she became "confused about [her] own rights" and whether she should speak with him further. Burnett further stated that Anderson "strongly discouraged [her] from hiring at attorney," saying that if she did so, he "w[ould]n't be able to talk with [Burnett] anymore and keep [her] informed of [Anderson's] plans," and that he "w[ould]n't be able to advise [Burnett] anymore."

¶ 15    According to Burnett's affidavit, Anderson called again on August 24, 2020, this time becoming angry and upset. Anderson raised his voice at Burnett and said that she "must leave" immediately, that it was "not [her] house," and that he would "evict [her] a***." Burnett also said that Anderson represented that he controlled whether the eviction case would be sealed and that if she did not vacate promptly, the case would not be sealed. Finally, Burnett stated that she "did not previously know about the court order of September 17, 2020," that it was not shared with her "either before or after the September 16, 2020, court hearing," and that the first time she saw the order was when her attorneys discovered it and sent it to her.

¶ 16    Burnett further averred that she had been furloughed and lost income after testing positive for COVID-19 and lacked resources to move out of the property. Burnett stated that she required sufficient time to save up funds to move out after being " 'scammed' out of $4,500" by the phony landlord who was in control of US Bank's property.

¶ 17    In response, US Bank argued that there was no basis to vacate the agreed order. US Bank generally did not dispute Burnett's "factual history of this matter," in particular, any of Burnett's allegations regarding how she came to reside in the premises. US Bank did, however, contend that Burnett made several "misrepresentations" and "omitted facts" regarding her interactions with Anderson. US Bank alleged that Anderson immediately identified himself as the attorney for the owner and that he encouraged Burnett to "seek out the advice of counsel." In support, Anderson attached an email he sent Burnett after his initial phone call with her, in which Anderson wrote, "If and/or when you retain counsel regarding this matter, please pass this email along to them and ask them to give me a call." US Bank also stated that Anderson never promised that he could seal the file but indicated that if she agreed to move pursuant to an agreed order, US Bank would not name her individually in the forthcoming eviction complaint. US Bank further contended that, "[a]t no time did Attorney Anderson raise his voice or curse at [Burnett], it was [Burnett] who got angry and began to yell that she wasn't leaving and would have to be put out before terminating the call." Based on the conflicting versions of Anderson's interactions with Burnett, US Bank criticized the LCBH attorneys for failing to do "the due diligence required under Supreme Court Rule 137" and for "haphazardly penn[ing], sign[ing] and fil[ing] the inflammatory Motion accusing [Anderson] of severe breaches of Illinois' Rules of Professional Conduct with this Court without justification."

¶ 18    US Bank also filed a separate motion for sanctions under Rule 137. US Bank generally reiterated the denials of Burnett's rendition of her interactions with Anderson. US Bank alleged that Burnett's statement that she had not been provided documents in this case had "been proven to be untrue in light of the emails produced in [US Bank]'s Response" and that Burnett "likewise misrepresented the content and character of her conversations with Attorney Anderson." US Bank posited that the LCBH attorneys "may have been duped by" Burnett but argued that it would have been "appropriate and required" for the LCBH attorneys "to contact Attorney Anderson" before filing the motion to vacate and Burnett's affidavit.

¶ 19    On October 13, 2020, the parties appeared before the court via Zoom. The court asked the LCBH attorneys if Burnett planned to appear, and counsel indicated that she had started a new job that conflicted with the hearing time and did not plan to appear, but she could do so if necessary. The parties then offered argument on Burnett's motion to vacate. The LCBH attorneys argued that Burnett did not understand the terms of the agreed order and that the agreed order was not signed by Burnett. Counsel for Burnett acknowledged that it appeared that Anderson sent the draft order to Burnett at the same time as it was sent to the court, but counsel believed that Burnett did not have a copy, as she had been unable to provide it to counsel. US Bank argued that Burnett was "not legally residing at the property"; that Anderson had, in fact, e-mailed the agreed order to Burnett; and that the terms of that agreement were explained to Burnett in open court at the September 16, 2020, hearing.

¶ 20    The court then denied the portion of Burnett's motion seeking to vacate the agreed order. The court "sympathized with [Burnett]'s plight of allegedly being scammed," but noted that it had "admonished Burnett several times" that she could consult with an attorney before entering into an agreement. The court further noted that, although she had "ample time to do so," Burnett did

not inform the court that Anderson had made any threats at any time during the previous proceedings. The court further observed that Burnett "did not seem to be in any way impaired or incapable of understanding the proceeding or the agreement she made," and that, "at minimum," she understood the date she was supposed to move out. The court further found that Burnett had been copied on the order sent to the court.

¶ 21 Following the court's denial of Burnett's request to vacate the order, US Bank called a resident at the development as a witness. He testified that he "felt less safe knowing that someone who was not legally a resident there had, nonetheless, been living in the townhome development." The agreed statement of facts for the October 13, 2020, hearing indicates that the resident "described various disturbances" caused by Burnett, although it does not further expound on the nature of those disturbances, and that the resident acknowledged that he had not filed any written complaints or police reports regarding Burnett.

¶ 22 Following the above testimony, counsel for Burnett questioned whether further proceedings were moot in light of the court's denial of Burnett's request to vacate the agreed order, and US Bank agreed. Counsel for Burnett then argued that the case should be dismissed based on the eviction moratorium. US Bank argued that the moratorium did not apply to Burnett, characterizing her as a "squatter" and not a "tenant" protected by the moratorium. US Bank further argued that, even if the moratorium applied, the court had heard testimony that Burnett's occupancy of the premises "constituted a safety risk to others" and that its complaint alleged that she posed an "imminent and serious risk to the property itself." The court agreed with US Bank that the moratorium did not preclude Burnett's eviction.

¶ 23 Although the court had denied Burnett's motion to vacate, the court then asked Anderson whether US Bank would agree to give Burnett until October 31, 2020, to move out. US Bank

agreed on the condition that Burnett file no further motions, and the court entered an agreed order staying the eviction to October 31, 2020, and requiring Burnett to vacate by that date. The agreed order further provided for "a mutual release of all claims between the parties and their agents," except for the motion for sanctions against Burnett's attorneys, which remained pending, and the sealing of the file.

¶ 24     On October 27, 2020, and October 30, 2020, the LCBH attorneys filed a written response, and thereafter an amended response, to the motion for sanctions. The LCBH attorneys argued that Burnett's version of events was credible and consistent and that their motion had been well-grounded in law and fact. While Burnett had not prevailed on her motion to vacate, Burnett's attorneys argued that the standard to enter sanctions required affirmative misconduct, and that no one disputed the essential fact that Burnett had been victimized by a scam. They further argued that, regardless of Burnett's account regarding her interactions with Anderson, the agreed order was one-sided, written in a manner that would not be comprehensible to an unrepresented person such as Burnett, and generally reflected a gross disparity of capacity between the parties.

¶ 25     On October 30, 2020, US Bank filed a reply arguing that the allegations involving Anderson had been "egregious, inflammatory and potentially professionally damaging allegations of professional misconduct," which could have resulted in "severe impact *** had they not been disproved and found to be untrue." US Bank repeatedly argued that counsel for Burnett should have contacted Anderson prior to filing the motion to vacate.

¶ 26     The parties appeared for status on November 9, 2021. The parties informed the court that Burnett had moved out on November 4, 2020, and not October 31, 2020, as required. The court ordered the matter unsealed. The court then heard argument from the parties regarding the motion for sanctions.

¶ 27    Anderson, on behalf of US Bank, argued that Burnett's "motion to vacate the previous agreed order was based on a number of representations that were supported by her affidavit and then repeated in the motion to vacate by Attorney Campbell, who signed the motion and by [LCBH], the organization for whom he works." Anderson specifically referenced allegations that Anderson waited until the end of their conversation to disclose that he was an attorney, that he instructed her not to get an attorney, that he "cussed" at Burnett, and that he did not circulate certain documents to her. Anderson stated that he provided e-mails as proof that he had talked with defendant regarding obtaining counsel, as well as that he sent the agreed order to her. Anderson also denied cursing at Burnett. Anderson argued that the LCBH attorneys should have at least called or sent an email to Anderson to ask about his conversations with Burnett before they filed the motion. US Bank argued that by making the allegations in the motion to vacate, the LCBH attorneys had "thrown out" traditional notions of "civility and the willingness for the parties to work together" and had failed to "follow the traditional norms and mores" of "our profession." Anderson further alleged that if the LCBH attorneys were "going to hurl insults and innuendo against" him, that they "should have at least investigated by calling [him] or checking."

¶ 28    The LCBH attorneys argued that, in evaluating the inquiry required, the court had "to look to what was available." Specifically, they stated:

> "[I]f there was actually a transcript that could have been available, then we could have listened to that—literally listened to that MP3 to review what happened at that court proceeding, because we know that when *pro se* tenants appear in these courtrooms without benefit of counsel, they often don't understand what is happening; and, of course, feel intimidated, and know that their family's housing is on the line.

But unfortunately, despite our years of attempting to get these proceeding[s] recorded, that's not happening at this point because of the pandemic. So all we could look at, the only objective piece of evidence, is the order that ultimately was entered.

\*\*\*

We looked at the one piece of actual written evidence that we could access in evaluating her representations to us; and it wasn't just reasonable for us to rely on it. In fact, it completely supported her understanding that the court appearance and that the things that had happened to her were intimidating and confusing.

**\*\*\***

Counsel says that what we should have done was to give him a telephone call. He cites no authority that that would be a reasonable step of investigation; and we have found no authority.

\*\*\*

[H]ad we called Mr. Anderson and he had sent us these emails of his, it wouldn't prove indisputably as is his burden that anything in this pleading that we filed or the affidavit is verifiably untrue.

If anything, it bolstered our case from our perspective, \*\*\* that this order should have been vacated and for the simple reason that Mr. Anderson, by virtue of his email, conceded that the client never saw it before it was sent to this Court.

\*\*\*

We just have facts as our client told it to us; and she thought that Anderson strongly discouraged [her] from hiring an attorney; and she said something very

13

telling in there that she told us that made it in our affidavit that I think bolsters her version of events, which she heard that, 'If you hire an attorney, I won't be able to talk to you directly anymore,' which is actually a true statement; and I think not something that she would just know offhand to try to, you know, make up something phony.

From her perspective—I guess Mr. Anderson was trying to work with her— and so there is nothing Mr. Anderson has presented to you today, your Honor, to meet his burden. He seems to be proceeding under the theory this is some kind of defamation case, in which we, as a defendant, assert something is a hundred percent true as a defense.

It sounds like he has the burden reversed."

¶ 29 The court indicated that it was taking the matter under advisement and that a written order would be forthcoming.

¶ 30 On January 7, 2021, the court announced its decision to grant the motion for sanctions during a Zoom court proceeding, and thereafter issued a written order. In that order, the court provided its own account of the September 16, 2020, hearing, which occurred via Zoom. The court noted that, at the September 16, 2020, hearing, it granted Anderson's request to incorporate the parties' agreement into the agreed order and "provide a copy of the Order to [Burnett] via her email address." The court continued,

"Subsequently, Anderson emailed the Agreed Order to the court and [Burnett] which was later signed by [Burnett], forwarded to and entered by the Court on September 17, 2020. The Agreed Order entered by this court contained the same terms and provisions of [US Bank]'s offer this Court discussed with [Burnett]."

14

The court also noted that Burnett had not appeared as a witness at the December 15, 2020, hearing on the motion for sanctions.

¶ 31    In its analysis, the court noted that "clients are not always truthful when alleging facts upon which their attorney will use in support of their representation and/or defenses." However, the court stated that "reasonable due diligence is especially important to prevent the inappropriate and unfounded besmirching or sullying of an opponent's name and reputation in the legal community, which could adversely affect, or in some instances be ruinous, to that opponent's legal business or profession." The court acknowledged that only Anderson and Burnett had been present at their initial conversations but stated its belief "that many of the allegations made by [Burnett] and regurgitated in Attorneys Gilbert and Campbell's motion to vacate are patently false." The court noted that counsel "did not call on [Burnett] to corroborate the assertions made in her affidavit. This Court can only surmise that [Burnett] was not called to testify for fear of committing perjury." The court took issue with the characterization of Anderson as having conducted himself "fraudulently and unfairly," finding those allegations "unsubstantiated and border[ing] on being defamatory and slanderous" and inappropriate to make "without any objective support."

¶ 32    The court further described Burnett's characterization of Anderson's conduct as "troubling" because those allegations "could have been easily debunked with a little due diligence—a phone call with Attorney Anderson, or [a] familiarity with this Court's procedures on dealing with agreements made with self[-]represented litigants, as [Burnett] was initially." "To this point," the court noted that "litigants participating in cases via Zoom are aware that the proceedings are recorded and a transcript *** can be obtained by request." The court stated Burnett's attorneys "could have obtained a transcript of the September 16, 2020 hearing on this case," which it said would have revealed, among other things, repeated review of the terms of the

agreement, frequent inquiries regarding whether Burnett understood the terms, her affirmation that she understood, and the court's admonishment that she would be held to the terms and the consequences if she did not comply.

¶ 33    The court stated that this transcript would have also revealed that Anderson "inform[ed] [Burnett] that he would prepare the agreement for her signature, email it to her, and submit the executed agreement to this Court for entry. Subsequently, Attorney Anderson submitted the executed agreement to this Court for execution and filing."

¶ 34    The court concluded that Burnett's attorneys failed to conduct "a reasonable due diligence investigation" and instead "blindly accepted and reiterated *** false and potentially ruinous allegations" against a member of the bar and an officer of the court, a "sole practitioner whose legal practice is relied upon to support his and his family's livelihood." The court entered a fine to be paid to Anderson in the amount of $2000 as reimbursement for his legal expenses incurred contesting the allegations made against him and in pursuing the motion for sanctions. The court added that the fine was "not intended to be punitive."

¶ 35    Burnett's attorneys filed a timely appeal from that judgment, and in this court, the LCBH attorneys contend that the trial court abused its discretion in imposing sanctions against them, because the sanction award was based on several factual and legal errors.

¶ 36    As an initial matter, we note that US Bank concedes that sanctions were not properly assessed against Gilbert, as she did not sign the motion to vacate. Accordingly, we dismiss the appeal as to Gilbert, and we will analyze whether sanctions were properly assessed against Campbell, as the signing attorney, and his employer, LCBH.

16

¶ 37    Illinois Supreme Court Rule 137(a) (eff. Jan. 1, 2018) requires that an attorney certify that "to the best of his knowledge, information, and belief formed after reasonable inquiry," a pleading, motion, or other document

> "is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."

The purpose of Rule 137 is to "prevent abuse of the judicial process by penalizing claimants who bring vexatious and harassing actions." *Sundance Homes, Inc. v. County of Du Page*, 195 Ill. 2d 257, 285-86 (2001). The purpose of the Rule is not "to penalize litigants and their attorneys simply because they were zealous but unsuccessful." *Toland v. Davis*, 295 Ill. App. 3d 652, 658 (1998). Because of the penal nature of the Rule, courts must construe it strictly, must ensure the moving party has proven each element of the alleged violation with specificity, and should reserve sanctions for the most egregious cases *Webber v. Wight & Co.*, 368 Ill. App. 3d 1007, 1032 (2006); *Deutsche Bank National Trust Co. v. Ivicic*, 2015 IL App (2d) 140970, ¶ 24.

¶ 38    When a party asks that Rule 137 sanctions be imposed, that party bears the burden of proof. *Technology Innovation Center, Inc. v. Advanced Multiuser Technologies Corp.*, 315 Ill. App. 3d 238, 243 (2000). The party moving for sanctions must show that the opposing party made false allegations without reasonable cause. *Id.* (citing *In re Estate of Wernick*, 127 Ill. 2d 61, 77 (1989)). To be entitled to sanctions, a party has the burden of proving not only that the allegations of the complaint were made without reasonable inquiry, but also that the allegations of the complaint are untrue. *In re Estate of Wernick*, 127 Ill. 2d at 77; *Burrows v. Pick*, 306 Ill. App. 3d 1048, 1055 (1999).

¶ 39　The trial court must "set forth with specificity the reasons and basis of any sanction \*\*\* either in the judgment order itself or in a separate written order." Ill. S. Ct. R. 137(d) (eff. Jan. 1, 2018); see also *Twardowski v. Holiday Hospitality Franchising, Inc.*, 321 Ill. App. 3d 509, 513 (2001) ("In order to allow courts to conduct an informed and reasoned review of the sanction decision, Rule 137 requires that the trial court set forth the reasons and basis for its decision."). An appellate court may only affirm an imposition of sanctions based upon the reasons set forth by the trial court. *Sadler v. Creekmur*, 354 Ill. App. 3d 1029, 1045-46 (2004) ("Although a reviewing court may generally affirm a trial court's ruling on any ground supported by the record, regardless of the reasoning employed by the trial court [citation], this proposition has not been applied to rulings involving sanctions." A sanction order "may be sustained only upon the ground on which it was imposed."). A trial court's determination is afforded considerable deference, but it does not preclude a reviewing court from independently reviewing the record and finding an abuse of discretion if the facts warrant. *Pritzker v. Drake Tower Apartments, Inc.*, 283 Ill. App. 3d 587, 590 (1996). When reviewing a decision on a motion for sanctions, an appellate court's primary consideration is whether the trial court's decision was informed, was based on valid reasoning, and follows logically from the facts. *Whitmer v. Munson*, 335 Ill. App. 3d 501, 514 (2002); *Thomas Hake Enterprises, Inc. v. Betke*, 301 Ill. App. 3d 176, 182 (1998); *Liddle v. Cepeda*, 251 Ill. App. 3d 892, 894 (1993).

¶ 40　The imposition of sanctions is not to be based on a subjective, after-the-fact analysis or hindsight. *Washington v. Allstate Insurance Co.*, 175 Ill. App. 3d 574, 580 (1988). Rather, the proper standard for evaluating a party's conduct under Rule 137 is objective (*Burrows*, 306 Ill. App. 3d at 1051) and based on the reasonableness under the circumstances existing at the time of the filing (*Bennett & Kahnweiler, Inc. v. American National Bank & Trust Co. of Chicago*, 256

Ill. App. 3d 1002, 1007 (1993)). Applying this standard, we conclude that the trial judge abused his discretion in imposing sanctions against the LCBH attorneys in this case. See *Toland* , 295 Ill. App. 3d at 656.

¶ 41     Initially, it appears that the trial court utilized an incorrect standard in reviewing US Bank's motion for sanctions. The trial court explicitly indicated that the award was "compensation and reimbursement for Attorney Anderson's reasonable legal expenses incurred" in contesting the allegations made against him in the motion to vacate and in pursuing the motion for sanctions and that the award was "not intended to be punitive."

¶ 42     As stated above, sanctions pursuant to Rule 137 are penal in nature. While these sanctions may have a compensatory feature, they are analogous to punitive damages, which are designed to punish wrongdoers and deter others from the same conduct. *Id.* at 658. The purpose of Rule 137 sanctions is to discourage baseless actions and frivolous motions, rather than to shift fees in favor of prevailing parties or to penalize litigants and their attorneys simply because they were zealous but unsuccessful. *Id.* at 657-58 ("Litigation is inherently uncertain, and it would be unjust to punish litigants for exercising their right to file or defend a lawsuit. The poor would be discouraged from vindicating their rights, not based on the merits of their cases, but for fear of being penalized with their opponents' attorney fees.")

¶ 43     Additionally, the court appears to have used a heightened standard for allegations that are made against an attorney; that protection of an attorney's professional reputation requires additional "objective" support before allegations against that attorney can be brought in a court document. Although we do not condone bringing allegations against opposing counsel lightly, we observe that the allegations at issue here pertained to a conversation that occurred between Anderson and Burnett, for which the only available evidence would be the conflicting accounts of

19

Anderson and Burnett. There is no authority requiring that where a situation involves one person's word against another, an attorney must support allegations with additional "objective" evidence when they involve an attorney's professional reputation.

¶ 44    Burnett's allegations were supported by a sworn statement. While the trial court ultimately found Burnett's account unconvincing, its credibility determination does not provide support for a sanction award. See, *e.g.*, *Barrett*, 343 Ill. App. 3d 1184, 1199 (2003); *Peterson v. Randhava*, 313 Ill. App. 3d 1, 7 (2000) (" '[a] court should not impose sanctions on a party for failing to conduct an investigation of facts and law before filing if he presents objectively reasonable arguments for his position, regardless of whether those arguments are unpersuasive or incorrect' "); *Olsen v. Celano*, 234 Ill. App. 3d 1045, 1053 (1992) (facts being ultimately adverse to pleadings "is not enough to warrant an award of attorney fees"); *Webber*, 368 Ill. App. 3d at 1034 (where the plaintiff's claim was "disregarded by the jury in the end," but the plaintiff had "presented sufficient evidence at trial through testimony and documents to substantiate" it, the case was "not an egregious case meriting the imposition of sanctions").

¶ 45    Although the court was not convinced by Burnett's version of events, it does not follow that the LCBH attorneys failed to conduct a reasonable inquiry before bringing those allegations as part of her motion to vacate. The LCBH attorneys interviewed their client, Burnett, to ascertain her version of events and her interactions with Anderson and ensured that she was willing to swear to her version of events under penalty of perjury. Additionally, the LCBH attorneys obtained a copy of, and reviewed, the agreed order between Burnett and US Bank that was entered by the court.

¶ 46    We agree that a review of the agreed order shows that there was a reasonable basis to request that the order be vacated. Such motions are granted "in order to achieve substantial justice,"

20

and a court should vacate an order that "resulted from fraud, duress, coercion, unfair dealing, gross disparity in the position or capacity of the parties, or newly discovered evidence." *In re Tammy D.*, 339 Ill. App. 3d 419, 423 (2003); see also *Draper & Kramer, Inc. v. King*, 2014 IL App (1st) 132073, ¶ 39 (holding that the trial court abused its discretion in denying a *pro se* tenant's motion to vacate an agreed order granting her landlord possession of her apartment. The tenant misunderstood the terms of the order she signed, and that misunderstanding was reasonable in light of a previous conversation the tenant had with the property manager. Additionally, there was a disparity in the parties' bargaining power as the landlord was represented by an attorney and the tenant was not).

¶ 47 Based on the agreed order entered in this case, as well as Burnett's sworn statement, there was a reasonable basis for the LCBH attorneys to request that the agreed order be vacated. The order was drafted by US Bank, it was not signed by Burnett, and it used terminology that may not have been clear to Burnett as a *pro se* litigant. It also appears from our review of the record that the agreed order contained material terms that were different from those discussed at the hearing, providing further support for vacating that order. Most notably, the agreed statement of facts from the September 16, 2020, hearing indicates that Burnett agreed to a "mutual waiver of claims." However, the agreed order, drafted by Anderson, provides that all claims by Burnett against US Bank were "waived and fully released with prejudice *instanter*." Regarding the claims by US Bank against Burnett, however, the agreed order provided that if Burnett "vacate[d] as agreed, [US Bank] shall dismiss this suit *without prejudice* at the Compliance Status hearing and seal it." (Emphasis added). There is no indication from the agreed statement of facts that Burnett agreed to this clearly unequal "mutual waiver of claims" or, even if she had, that she was informed of the consequences of that agreement. It is also noteworthy that Burnett agreed to admit the allegations

of the complaint, although US Bank did not actually dispute the inaccuracy of many of those allegations. In particular, the complaint alleged that Burnett and her two young children were "squatters" who "presumably [broke] in and changed the locks." At the same time, however, US Bank did not dispute Burnett's account of how she came into possession of the premises through circumstances in which she entered a lease with, and was given the keys by, someone she believed had the authority to lease the premises.

¶ 48   Additionally, it would be reasonable to conclude that Burnett and US Bank were in disparate positions in negotiating the agreed order, as Anderson is an experienced eviction attorney and Burnett was a *pro se* litigant. The agreed order, particularly when combined with Burnett's sworn statement, provided ample basis to argue that the agreed order should be vacated in order to achieve substantial justice between the parties. The LCBH attorneys presented evidence to the trial court, from which the court could have found that vacating the agreed order was appropriate, had it believed Burnett's account. In these circumstances, we disagree that the motion was submitted without reasonable inquiry, or that it was not well grounded in fact and warranted by law.

¶ 49   The trial court, however, found that the LCBH attorneys failed to engage in two specific actions that would have "easily debunked" Burnett's allegations: "a phone call with Attorney Anderson" and a review of the "transcript of the September 16, 2020, Zoom hearing on this case."

¶ 50   US Bank pointed to nothing that would indicate why the LCBH attorneys were obligated to contact Anderson or why, had they done so, they would have been required to credit his version of events over their client's sworn statement regarding the conversation in which Anderson and Burnett were the only participants. *Edwards v. Estate of Harrison*, 235 Ill. App. 3d 213, 221 (1992) ("[A]n attorney is not obligated to voluntarily dismiss his lawsuit merely because the opposing party presents purported evidence of a crucial fact in his pleadings."). While it is true that an

22

attorney cannot simply rely on a client's representations when additional information is readily obtainable from third parties (see *Williams Montgomery & John Ltd. v. Broaddus*, 2017 IL App (1st) 161063, ¶ 42 (*as modified on denial of reh'g* (Dec. 8, 2017))), there was no information from a third party that the LCBH attorneys could have obtained to further confirm Burnett's account about the content of her conversations with Anderson, when the only parties to that conversation were Burnett and Anderson. Additionally, confirming the content of their conversation by calling Anderson would not be the kind of "objective" verification that the LCBH attorneys could be expected to undertake. Although Anderson presumably would have denied that the conversation happened as described by Burnett, accepting those denials based on vague notions of "civility" and upholding "traditional norms and mores" of "our profession" would interfere with the LCBH attorneys' obligation to zealously advocate for the interests of their client.

¶ 51    The only other failure of diligence by the LCBH attorneys specifically referenced by the trial court was that they should have been aware that "the proceedings are recorded and a transcript can be obtained by request" and they should have reviewed that transcript before bringing the motion to vacate. However, both parties concede in this court that the trial court was mistaken on this fact and that no such transcripts of the relevant hearing existed. Both parties also concede that, although the court observed several times that the agreed order was signed by Burnett, it was not.

¶ 52    US Bank argues that the trial court's mistakes on these facts are irrelevant, as the agreed order was reached during the September 16, 2020, hearing and was enforceable even if no transcript or order memorializing the agreement existed. However, as found above, the agreed order, as memorialized by Anderson, appears to differ in significant ways from the agreement reached at the hearing. Moreover, the question is not whether the agreement would have been enforceable. Instead, the issue is that the trial court relied on these mistaken beliefs in evaluating

23

the diligence of the LCBH attorneys in bringing a motion to vacate the agreed order. US Bank also alleges that the court's reference to a transcript is not significant because it was not the "exclusive method of conducting a reasonable inquiry." However, the only other method articulated by US Bank was "picking up the phone and calling a colleague," which we have already rejected for the reasons set forth above.

¶ 53   Finally, the court indicated that it relied on the "testimony" of attorneys Anderson, Gilbert, and Campbell in issuing the sanction against the LCBH attorneys, and in this court, US Bank similarly argues that the court properly "assess[ed] the testimony [of] Attorneys Anderson, Gilbert and Campbell." It is clear, however, from our review of the record that no testimony was ever elicited. Instead, Burnett filed a sworn statement, and Anderson disputed aspects of her account in a verified response to her motion to vacate. While it is true that the attorneys presented arguments regarding the motion for sanctions as officers of the court, it is not fair to say that the court heard testimony from anyone regarding that motion. See Black's Law Dictionary (11th ed. 2019) (Testimony is defined as "evidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition."). Anderson was not sworn or subject to cross-examination regarding his conversations with Burnett, and neither Gilbert nor Campbell were sworn or subject to cross-examination regarding their interactions with Burnett and what actions they took in investigating her allegations. In these circumstances, we conclude that US Bank failed to meet its burden of showing that sanctions were appropriate.

¶ 54   In light of the errors set out above, we cannot conclude that the trial court's decision was properly informed, was based on valid reasoning, and followed logically from the facts. See *Thomas Hake Enterprises, Inc.*, 301 Ill. App. 3d at 183-84 (finding a sanction award to be an abuse of discretion where the plaintiffs' complaint, although ultimately unsuccessful, was "sufficiently

well grounded so as not to be frivolous or false" and the plaintiffs arguments were "not unreasonable under the[ ] circumstances."). As stated above, this court may only affirm an imposition of sanctions based upon the reasons set forth by the trial court. *Sadler*, 354 Ill. App. 3d at 1045-46. Having found that the reasons set forth by the trial court created a heightened burden for allegations against Anderson as an attorney and were based on a misunderstanding of what information was available to the LCBH attorneys in bringing the motion to vacate, the sanctions order must be reversed. It is clear from the record that when the LCBH attorneys moved to vacate the agreed order, they had a reasonable basis to do so on the merits of the case, and they made a reasonable inquiry under the circumstances. Accordingly, we hold that their motion should not have subjected them to Rule 137 sanctions. We cannot conclude that this is one of the most egregious of cases for which sanctions should be reserved. See *Webber*, 368 Ill. App. 3d at 1032.

¶ 55     As a reminder to all parties, although we understand an attorney's desire to zealously advocate for his or her client, zealous advocacy should not include incivility or unprofessional behavior. An attorney's choice of words is significant, has consequences, and should demonstrate the utmost respect for judges, opposing counsel, litigants, the legal process, and the justice system, at all times.

¶ 56     For the foregoing reasons, we reverse the trial court's order assessing sanctions against the LCBH attorneys.

¶ 57     Reversed.

---

**No. 1-21-0135**

---

| | |
|---|---|
| **Cite as:** | *US Bank Trust, N.A. v. Burnett*, 2021 IL App (1st) 210135 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-M1-705770; the Hon. James A. Wright, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | H. Nicholas Berberian, Tina L. Winer, and Daniel M. Terhune, of Neal, Gerber & Eisenberg LLP, of Chicago, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Robert Kahn and Michael Griffin, of Sanford Kahn, LLP, of Chicago, for appellee. |

---

| | |
|---|---|
| *Amicus Curiae***:** | Miriam Hallbauer and Lawrence D. Wood, of Legal Aid Chicago, of Chicago, *amicus curiae*. |

---